Good afternoon. Archer Daniels Midland v. Sinele. How do you pronounce that? Sinele, Your Honor. Sinele. Very good. For the appellate, Mr. Callaway. For the appellate, Mr. Stocks, you may proceed. Good afternoon, Your Honors. May it please the Court, as Courts where I am here on behalf of Mr. Sinele and his solely owned consulting business, which is the other defense by the name of LSAG, Link LLC, which I'll refer to as Sinele, essentially. And this is an interlocutory appeal of a preliminary injunction order that was entered through oral findings on September 27, 2018, after essentially a full day of evidence. And that hearing followed a TRO, temporary restraining order, that had been entered two weeks earlier without notice to Mr. Sinele. And then there was the subsequent order, October 1, 2018, in writing, which prohibits the defendants preliminarily from transacting any business activity involving sales-slash-purchase in the sweeteners market involving any ADM by our customer service by Sinele, any time during the last two years of his employment. The facts show, I'm not going to recite all the facts, is that Mr. Sinele resigned as a sales representative from ADM on August, effective August 3, 2018, then started a consulting business after that. Prior to that point, he had been a part-time farmer, has a farm, has been in his family for generations, and a full-time sales rep, employee of ADM. Then he went to a part-time consultant, or attempted to, and a full-time farmer. So that was his plan. So he used to sell it, now he wants to help people buy. His position was, on behalf of ADM, to sell the sweetener products, and there are five companies that do that, manufacture and sell sweetener products. Then in his consulting business, to serve as a consultant for the buyers. So, and very germane to that question, which I'll get to the standard here in a bit, is that he's not working for one of the five competitors. This is not a case where someone left Tate & Lyle to go to ADM, or ADM to go to Tate & Lyle. Did these buyers have consultants working for them before, or is this a new concept that your client developed after he left ADM? Well, I don't know if buyers used any particular, because to me, it is a new concept that Mr. Sinley intended to do as a part-time consultant. So you don't know if the buyers had consultants that had used them in the past, or whether he has competition of his own, meaning there were other consultants who represent different buyers. No, there's no evidence on that point, Your Honor.  I don't think so. Yeah, I mean, I think any buyer, I can use a consultant to serve for me, which I do, to buy insurance, to buy homeowners, to buy whatever, and I use them. People use agents, buy houses and so forth, but to be responsive to your question, there wasn't evidence about others serving as a consulting business. It was something Mr. Sinley decided to do based on the evidences in that, his degree in agriculture and his MBA, and that he's been in the agriculture business. Well, it would be fair to say, in his position at ADM, if there were consultants, he would probably have known about them, because he probably would have had dealings with them. That may be true, and I do understand there was some evidence that ADM would use consultants or brokers for its business in some capacity, and that there was evidence of a discussion between Mr. Sinley and Mr. Lutt to possibly do that. So he would be working part-time, but ADM was not interested in retaining him as a consultant to be a broker for ADM after he resigned, and then he came up, he decided to pursue his consulting business afterwards to represent buyers. Now, I think it's significant that the trial court, at the end of the hearing on September 27, 2018, when addressing, entering the extent of the order orally from the trial court, is that the court finds the people, excuse me, not the people, but the petitioner has proven by a preponderance of the evidence, the necessary elements for the issuance of a preliminary injunction, and when the court got to then setting a bond, the court stated, and I'm quoting this, Well, with all due respect to counsel, I think the bond should be higher than what he's recommended. I don't know that I'm right today. I don't know that I'm wrong. I would hope that I'm right, but if I'm not, the appellate court sees it differently. I don't want him to lose any funds. The bond will be set at $250,000. I'm here today to respectfully submit the trial court got it wrong and implore this appellate court to see it differently based upon the standards that have been enunciated as to when a former employer can obtain a court created non-competition restriction when there is no restrictive covenant in any agreement that the former employee had with the former employer, which the facts are undisputed here. The former employee had no restrictive covenant agreement with ADM. The only thing he had was about a two-page non-disclosure agreement back around 1990 and when he started with ADM after he finished all his education, which describes inventions protection and has a couple of sentences that he will not disclose confidential information. Significantly, there was no evidence of any violation of that agreement. Mr. Lutt, the president of the Sweeteners Division for ADM, acknowledged that there was no evidence, no facts, no information known that Mr. Sinley had violated that confidentiality obligation. And, very importantly, given the standards involved that govern under Illinois law, entry by a judge of a restrictive covenant under the inevitable disclosure of trade secrets doctrine, that those standards were not met. And I believe the former employer of the court, to reach that conclusion, now the key case that I've cited in the opening reply brief is the Triumph packaging case. Now that is a case where the court discussed what the standards are to have a court create a non-compete agreement where the employee never signed one. And the court stated, in Triumph Packaging Group v. Ward, courts consider the following factors in determining whether disclosure of trade secrets is inevitable. One, the level of competition between the former employer and the new employer. Two, whether the employee's position with the new employer is comparable to the position he held with the former employer. And three, the actions that the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer. And the court goes on to say the mere fact that someone assumes the position at a competitor does not, without more, make it inevitable that he will use or disclose trade secret information. And that the fear that its former employee, fear of the employer, will use trade secrets of the new position is insufficient to justify application of the inevitable disclosure of trade secrets doctrine. The employer must demonstrate a, quote, high probability that the employee, former employee, will use them. And went on to indicate it's a sparingly used doctrine for good reason because it results in a court creating a non-compete restrictive covenant that the employee never agreed to. So when we apply those tasks that were not articulated in any findings of the trial court, there was, first off, Mr. Shinley's not working for a competitor. Both sides acknowledge there are five companies involved in the manufacturing and selling of the sweetener's products, one of which is ADM. His consulting business on behalf of buyers or customers is not one of those competitive companies. The others are Tate and Lyle, Cargill, Ingredient, and Roquet. Mr. Shinley's not working for a competitor. So that is the first basis that we respectfully submit there should be no judicially graded non-compete obligation or restriction on running a consulting business. Then secondly, and I submit that that should resolve the case, but I respect we need to address other issues. But the second point here is when you look at the case where the sparingly used doctrine allows a court to create a non-compete restrictive covenant the former employee never agreed to. I submit you will see that there has always been something on which there could be a conclusion to support an inevitable disclosure of a trade secret that the former employee downloaded all types of confidential information, put them on a thumb drive, printed and took proprietary documents and information. I believe the court, your honors, would say that's when that doctrine has been used. Not here, when the only evidence that was presented was that Mr. Shinley had access to confidential information as a result of his employment with ADM. So the question is what is the trade secret? How could it be utilized? Yeah, and it's really two questions, your honor. One, has a trade secret been clearly identified? Then two, what is the evidence which is needed to show there's a high probability that an identifiable trade secret will be disclosed? And not that, well, maybe something may be or, you know, fear or belief. So what is the evidence, one, of a particularized trade secret? In the oral findings, the court identified that there was evidence of four or five items of confidential information, which Mr. Lott, the president of the Sweetener's Division, testified about. We're not disputing that Mr. Shinley, like most employees of a company or a sales rep, wouldn't have access to some kind of confidential information along the way. But there was no evidence whatsoever of any use of confidential information of ADM. No evidence whatsoever of any disclosure of confidential information of ADM. No evidence, as in other cases, of some nefarious conduct where a former employee downloads and takes valuable proprietary information or has used it. So those are the two keys. There's not a competitor and there really was no evidence of any nefarious conduct, taking anything. There was a lot of evidence about this system, data system called Tableau, upon which confidential information is stored. But there was no evidence that Mr. Shinley would access that in his job, that he took anything from this Tableau system, and, in fact, the evidence is clear. He couldn't even access that when he had left, and that there was no evidence of any nefarious conduct.